**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

JEFFREY LILLIEN,

Plaintiff,

v.

PEAK6 INVESTMENTS, L.P. an Illinois limited partnership, and PEAK6 L.L.C., an Illinois limited liability company, its general partner,

Defendants.

Case No. 03 C 2292

Judge James H. Alesia

MAY 2 9 2003

FILED

MAY 2 8 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**NOTICE OF FILING**

TO: Ms. Julie Gottshall
KATTEN MUCHIN ZAVIS ROSENMAN
525 W. Monroe St.
Suite 1600
Chicago, IL 60661

PLEASE TAKE NOTICE that on May 28, 2003, we filed with the Clerk of the U.S. District Court for the Northern District of Illinois, Eastern Division, Plaintiff's AMENDED COMPLAINT, a copy of which is attached hereto.

Terrence Buehler

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that he served a copy of the aforementioned document upon the above addressee on May 28, 2003, before the hour of 5:00 p.m., by depositing same in the U.S. Mail with proper postage prepaid and by facsimile transmission.

Terrence Buehler

BUEHLER REED & WILLIAMS
19 South LaSalle Street
Suite 1500
Chicago, Illinois 60603
(312) 372-2899



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTIRCT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY LILLIEN,<br><br>Plaintiff,<br><br>v.<br><br>PEAK6 INVESTMENTS, L.P. an Illinois limited partnership, and PEAK6 L.L.C., an Illinois limited liability company, its general partner,<br><br>Defendants. | ) | Case No. 03 C 2292<br><br>Judge James H. Alesia |

MAY 2 9 2003

FILED

MAY 2 8 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

AMENDED COMPLAINT

Plaintiff, JEFFERY LILLIEN, by his attorneys, Buehler, Reed & Williams, for his complaint against Defendants PEAK6 INVESTMENTS L.P., an Illinois limited partnership, and PEAK6 L.L.C., an Illinois limited liability company, states as follows:

PARTIES

1. At the time of filing his initial complaint, Plaintiff, Jeffrey Lillien, was not a citizen of Illinois.

2. At all times relevant herein, Defendant, PEAK6 Investments, L.P. ("Peak6 Investments") was an Illinois limited partnership and a market-maker in exchange traded options with its principal place of business located at 209 South LaSalle Street, Suite 200, Chicago, Illinois 60606.

3. At all times relevant herein, Defendant, PEAK6, L.L.C. was the general partner of Peak6 Investments. PEAK6, L.L.C. is an Illinois limited liability company with its principal place of business located at 209 South LaSalle Street, Suite 200, Chicago, Illinois 60606. These entities, unless otherwise indicated, will be referred to collectively as "Peak6."



## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 in that the parties are citizens of different states and the amount in controversy exceeds $75,000.

5. Venue is proper in this district pursuant to 28 U.S.C. §1391(a), in that a substantial part of the events giving rise to the claims took place in this district and the defendants reside in this district.

## IMPORTANT NON-PARTIES

6. At all times relevant herein, Matthew Hulsizer and Jennifer Makowiec were the majority owners and operators of Peak6, L.L.C.

## ALLEGATIONS COMMON TO ALL COUNTS

7. In or about March 1, 2001, Mr. Lillien was employed as a senior attorney for Bank One in Chicago. For reasons not relevant to this litigation, Mr. Lillien began pursuing employment opportunities outside Bank One.

8. Mr. Lillien's job search brought him into contact with UBS, a large multinational financial services company based in Switzerland, but with substantial businesses and global legal headquarters located in the United States.

9. After much negotiation and many interviews, UBS informed Mr. Lillien that he was receiving serious consideration for a senior position in their law department. Mr. Lillien also was a candidate for the position of general counsel of the International Swaps and Derivatives Association in New York. He had also received an expression of interest from Merrill Lynch's main offices in New York.

10. Faced with all these job opportunities, Mr. Lillien sought the advice and counsel of Mr. Arthur Hahn, the managing partner of Katten, Muchin and Zavis ("KMZ"), a large

Chicago law firm. Mr. Hahn counseled Mr. Lillien that one of KMZ's clients, Peak6, was looking for a general counsel and that it was a rising company that could enable Mr. Lillien to stay in Chicago. In his Bank One position, Mr. Lillien had been involved in negotiation of a possible business relationship between Bank One and Peak6 and had previously met Mr. Hulsizer and Ms. Makowiec. Mr. Hahn offered to contact them on Mr. Lillien's behalf to see if they were still seeking a general counsel.

11. The day after his meeting with Mr. Hahn, Mr. Lillien received a call from Mr. Hulsizer, requesting a meeting. This meeting took place a few days later. Within a week, Mr. Hulsizer and Ms. Makowiec indicated that they were very interested in hiring Mr. Lillien.

12. In late April, UBS informed Mr. Lillien that they would be tendering a job offer to Mr. Lilllien. When informed of this development, Ms. Makowiec asked Mr. Lillien to come to Peak6's offices to meet with her. At that meeting, Ms. Makowiec informed Mr. Lillien that Peak6 was planning to make a job offer to Mr. Lillien. Ms. Makowiec pointed out that when Peak6 made a job offer, it expected the candidate to make an employment decision within one week.

13. Approximately one week later, UBS tendered a formal job offer to Mr. Lillien. The offer was for a base salary of $150,000, a guaranteed bonus of $175,000, and $150,000 of UBS stock (as replacement for Bank One restricted stock and options that Mr. Lillien would have to forfeit if he left Bank One), along with UBS' benefit package (including retirement plan contributions and 401(k) contributions).

14. A few days later, on May 5, 2001, Peak6 made its offer to Mr. Lillien. The terms of Peak6's offer were memorialized in a letter to Mr. Lillien dated May 9, 2001, a copy of which is attached hereto as Exhibit A. Under the terms of its offer, Peak6 and its principals offered to

pay Mr. Lillien a base salary of $150,000 and a bonus of $150,000 (that, unlike the UBS bonus, would be prorated from Mr. Lillien's start date). In replacement for Mr. Lillien's Bank One stock, Defendant Hulsizer also offered Mr. Lillien Peak6 stock options worth $500,000 (as calculated according to the accepted Black-Scholes valuation model), 25% percent of which would vest immediately upon the public offering of Peak6's stock. According to statements made by both Mr. Hulsizer and Ms. Makowiec, the closing for this public offering was expected to occur in approximately one month.

15. Because Peak6 was not then publicly traded, the stock was not freely saleable on any public market or exchange. However, Mr. Hulsizer and Ms. Makowiec informed Mr. Lillien that they had made the decision to take the company public with an initial public offering ("IPO"). Peak6 had already filed its initial registration statement with the SEC in April. Mr. Hulsizer and Ms. Makowiec had noted the extensive preparations for the IPO, specifically pointing out that they had recently hired a chief financial officer (a "CFO") and their desire to also hire a general counsel to round out their senior management and give them more credibility. According to Mr. Hulsizer and Ms. Makowiec, the remaining work on the IPO was substantially done and the first thing Mr. Lillien would work on when he joined the company was the closing of the IPO.

16. Given that the success of an IPO for a startup broker-dealer depended heavily upon the financial performance of the company, Mr. Lillien asked how the company had performed recently. Both Mr. Hulsizer and Ms. Makowiec had previously reported to Mr. Lillien that Peak6's financial performance had far exceeded the performance that Mr. Lillien was aware of when he had been involved in business discussion on behalf of Bank One. In response to Mr. Lillien's specific follow-up question, Mr. Hulsizer reiterated that Peak6 had had a wildly

successful year in 2000 and was well ahead of that pace for the first quarter of 2001. Mr. Hulsizer noted that he could not be certain that the company's earnings would continue to accelerate as rapidly as they had in the past year, but he stressed that the company would do extremely well for the full year of 2001, with expected revenue well in excess of $100 million. Mr. Hulsizer also stressed that if the company did well, Mr. Lillien's bonus would be much more than one times his salary, and could reach as much as one million dollars. Mr. Lillien asked Mr. Hulsizer what would happen if Peak6 did poorly. Mr. Hulsizer stated that if Peak6 lost money, it was conceivable that Mr. Lillien might not receive a bonus. When pressed further by Mr. Lillien, Mr. Hulsizer stated that Mr. Lillien's "low side" bonus, i.e., his bonus if the company had weak financial performance, would be $100,000. Mr. Hulsizer also repeated to Mr. Lillien that Peak6 had a policy that it required a response to a job offer within one week.

17. Mr. Lillien consulted with Mr. Hahn of KMZ regarding the two pending job offers and other possibilities. Mr. Hahn discouraged Mr. Lillien as to the UBS offer, claiming that it was "light." As to the offer made by Peak6 (KMZ's client), Mr. Hahn noted that it was an "entrepreneurial situation," but that the key thing in such situations was the ethics of its principals. When Mr. Lillien specifically inquired as to the ethics of Mr. Hulsizer and Ms. Makowiec, Mr. Hahn responded that their "moral compass pointed in the right direction." When Mr. Lillien suggested that he was concerned that he should ask for a higher base salary and request further assurances in writing as to stock options, Mr. Hahn cautioned Mr. Lillien that such a request might alienate Peak6, and that a smarter strategy would be to operate on a basis of trust with Mr. Hulsizer and Ms. Makowiec. Given Mr. Hahn's statements, the financial terms offered and the prospects for the future (both for the company and for Mr. Lillien), and the

repeated assurances that the IPO was all but ready to go, Mr. Lillien accepted the offer from Mr. Hulsizer, Ms. Makowiec and Peak6 on May 9, 2001.

18. When Mr. Lillien presented his signed acceptance in person to Mr. Hulsizer the next day, Mr. Lillien asked how Peak6 was handling the effects of recent Federal Reserve interest rate decreases. Mr. Hulsizer repeated his optimistic forecast for Peak6, telling Mr. Lillien that "we're doing fine." Mr. Hulsizer told Mr. Lillien how excited he was about Mr. Lillien joining Peak6, and that he looked forward to bringing Mr. Lillien to meetings with prospective investors and the instant credibility that Mr. Lillien would bring to Peak6 given Mr. Lillien's seniority and his recognized expertise in derivatives.

19. Mr. Lillien informed Bank One that he would be leaving the position that he had held for over eighteen years. Mr. Lillien also expressed his regrets to UBS and other parties that had indicated interest in him.

20. On May 18, 2001, the day before Mr. Lillien and his wife were scheduled to leave on a 10-day vacation, Mr. Lillien had lunch with the attorneys at KMZ who were working on the IPO for Peak6. At that lunch, when Mr. Lillien inquired as to the expected closing of the IPO, he was informed by Wesley Nissen (the partner at KMZ who was primarily responsible for representing Peak6) that the closing might be "a little later in June" than had been indicated to Mr. Lillien. Mr. Nissen noted to Mr. Lillien, "you have heard, of course, that the company's CFO has left." When Mr. Lillien indicated no knowledge of any such event, Mr. Nissen simply said "oh," indicated that a replacement was expected, and offered no further explanation.

21. Mr. Lillien began work at Peak6 on May 30, 2001. Upon his arrival, Mr. Lillien was surprised to be informed that he would begin working on a private placement, rather than an IPO. Mr. Lillien was told that the IPO would be postponed until a new CFO was hired. Mr.

Lillien was stunned that there was any contingency whatsoever as to an IPO. Mr. Lillien also gradually learned that, contrary to statements previously made by Mr. Hulsizer, Peak6 had suffered enormous losses beginning at the end of April and continuing through the first week of May.

22. After months of postponements, the week before Thanksgiving, the company called off the proposed IPO. In January, Mr. Lillien was asked to report to the new CFO. He objected to this on various grounds, in particular that this reporting relationship would jeopardize the independence of legal advice for the company. Rather than respond to Mr. Lillien's ethical concerns, on January 22, 2002, without warning or preamble, Mr. Hulsizer and Ms. Makowiec fired Mr. Lillien. Mr. Hulsizer informed Mr. Lillien that his termination was effective immediately.

23. Part and parcel with Peak6's summary dismissal of Mr. Lillien, Mr. Hulsizer informed Mr. Lillien that his bonus would be $30,000, a fraction of what had been promised to him (particularly given that Peak6 had still had revenue in excess of $60 million and net profit in excess of $20 million). Although no contingencies were stated in Peak6's performance bonus plan, Mr. Hulsizer and Ms. Makowiec made Mr. Lillien's bonus contingent upon the performance of additional legal work by Mr. Lillien, without any further pay, to prepare the matters that he had been handling so that they could be transitioned to KMZ and the CFO.

24. This termination also wiped out the options that had been promised to Mr. Lillien, leaving him with none of the compensation that had been promised to him for surrendering his Bank One stock.

25. During the time period that Mr. Lillien was allowed (as required under federal law for employees of Mr. Lillien's age) to consider the release demanded by Peak6, he was

repeatedly pressured by Peak6 and its agents. The company's health insurance provider refused to pay Mr. Lillien any of the funds that Mr. Lillien had deposited into a medical savings account. The health insurance provider also refused to offer Mr. Lillien the continuation of health insurance (which is required under federal law) unless Mr. Lillien made further payments into this blocked medical savings account directly to Peak6. When Mr. Lillien specifically objected that this arrangement would allow Peak6 to have control over his medical funds, the company's health insurance provider told Mr. Lillien that this arrangement was being required by the human resources officer of Peak6, Karen Day. Although Mr. Lillien, under advice of his own counsel and the U.S. Department of Labor, informed the health insurance provider that this requirement was a violation of federal law, they refused to return any of Mr. Lillien's medical savings account to him for almost four months.

## COUNT I
## BREACH OF CONTRACT

26. Plaintiff repeats and realleges paragraphs 1-25 as though fully set forth herein.

27. Pursuant to the terms of his contract with Peak6, Mr. Lillien performed various legal duties commensurate with his position as general counsel.

28. For its part, Peak6 agreed to pay Mr. Lillien a bonus that was determined by the performance of the company and had a stated target bonus (on a prorated basis) of $100,000 and a minimum bonus (on a prorated basis) of $65,000.

29. Notwithstanding its contractual commitment to pay Mr. Lillien such a bonus, Peak6 paid him $30,000, when under the terms agreed upon by the parties, the bonus should have been in excess of $50,000.

30. Notwithstanding the promises by defendants to deliver $500,000 of stock options to Mr. Lillien, Mr. Lillien received nothing whatsoever in consideration for his agreement to surrender his Bank One stock and for his performance of his employment obligations.

31. Mr. Lillien has therefore been damaged by this breach of contract in the amount in excess of $500,000.

**COUNT II**
**FRAUD IN THE INDUCEMENT**

32. Plaintiff repeats and realleges paragraphs 1-31 as though fully set forth herein.

33. Based upon the promises of Peak6, Mr. Hulsizer and Ms. Makowiec, Mr. Lillien turned down the offer from UBS, with its higher salary, guaranteed bonus and restricted stock in a publicly traded company. In so doing, he was fraudulently induced to turn down a guaranteed package of $475,000 in direct compensation.

34. In addition, Mr. Lillien was induced to accept the offer from Peak6, Mr. Hulsizer and Ms. Makowiec based upon their promises that the company was planning an imminent IPO because of its recent strong financial performance.

35. Peak6, Mr. Hulsizer and Ms. Makowiec's representations were false. Peak6 had recently fired its CFO and had begun experiencing financial reverses. The Defendants had already determined to postpone the IPO at the time that Mr. Lillien was considering their offer. This had the consequent effect of creating an undisclosed contingency as to these options, making the options virtually worthless. Moreover, as the Defendants well knew (as evidenced by the fact that they hid this fact from Mr. Lillien until after he joined the company), the abrupt resignation by the CFO further complicated, and made difficult the company's planned IPO.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Jeffrey Lillien, respectfully requests that this Court enter judgment in his favor and against the Defendants, Peak6 Investments, L.P. and Peak6, L.L.C., in an amount in excess of $500,000 as determined by the trier of fact, together with prejudgment interest, costs, including reasonable attorneys' fees and such other and further relief as this Court deems just.

Terrence Buehler

BUEHLER REED & WILLIAMS
19 South LaSalle Street
Suite 1500
Chicago, Illinois 60603
(312) 372-2899