

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2292 | **DATE** | 6/25/2004 |
| **CASE TITLE** | Jeffrey Lillien vs. Peak6 Investments, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Defendants' motion for summary judgment is GRANTED. Enter memorandum and opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | JUN 3 0 2004 date docketed | |
| ✓ | Docketing to mail notices. | | | 31 |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| SLB | courtroom deputy's initials | 2004 JUN 29 PM 7:47 Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JEFFREY LILLIEN, | |
| Plaintiff, | |
| v. | No. 03 C 2292 |
| | Judge James B. Zagel |
| PEAK6 INVESTMENTS, L.P. and PEAK6 L.L.C., | |
| Defendants. | |

DOCKETED
JUN 3 0 2004

## MEMORANDUM OPINION AND ORDER

### I. Background

In March 2001, Plaintiff Jeffrey Lillien, who had been an in-house attorney with First Chicago and its successor, Bank One, for over eighteen years, decided to enter the job market. By May of that year, Lillien had received two competing offers, one from UBS, a large multinational financial services company, and one from Defendants Peak6 Investments, L.P. and Peak6 L.L.C. (collectively "Peak6"), a smaller options trading firm. Ultimately, Lillien passed up UBS's offer for a senior position in its law department, which included a base salary of $150,000, a guaranteed bonus of $175,000, and $150,000 of UBS stock, to become Peak6's General Counsel. In its May 4th and May 9th offer letters, Peak6 promised to provide Lillien with a base salary of $150,000, a discretionary bonus, and stock options from the company's pending IPO. Lillien alleges that Peak6 principals Matthew Hulsizer and Jennifer Just also promised him that, barring a catastrophe, he would receive a year-end target bonus of $100,000 and roughly $500,000 worth of stock options. Lillien alleges that Hulsizer and Just assured him, during their negotiations, that the IPO would occur in late May or early June and that the company was in a

strong financial position. According to Lillien, these assurances led him to accept Peak6's offer on May 9, 2001.

When Lillien started work, he realized that Peak6 was not doing as well as he had expected. Upon starting, Lillien learned that the IPO was postponed, Peak6's second quarter revenues were reported as "flat," Peak6 has suffered severe financial losses in mid-May, and Peak6's CFO had quit and had not yet been replaced. In November 2001, Peak6 finally, after many postponements, cancelled its plans for an IPO. In January 2002, Hulsizer and Just fired Lillien and informed him that his year-end bonus would be $30,000, less than a third of what Lillien expected. Thereafter, Lillien brought this suit claiming breach of contract and fraudulent inducement.

## II. Analysis

Peak6 now moves for summary judgment on both of Lillien's claims. Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986). In determining whether any genuine issue of material fact exists, I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). A genuine issue of fact exists only when, based on the record as a whole, a reasonable jury could find for the non-movant. *Pipitone v. United States,* 180 F.3d 859, 861 (7th Cir. 1999).

### A. Lillien's Breach of Contract Claims

In Count I of his complaint, Lillien claims that he was entitled to a pro-rated bonus in excess of $50,000 and stock options in the amount of $500,000. Lillien bases these claims on

representations made to him by Peak6 principals Hulsizer and Just. Lillien alleges that Hulsizer assured him that he would receive a bonus in excess of $100,000 and that both Hulsizer and Just assured him that Peak6's IPO was a virtual certainty.

### 1. Lillien's Bonus

With regards to Lillien's bonus, Peak6 argues that Lillien could not have believed Hulsizer's statements concerning the bonus target of $100,000 constituted an offer because they ran contrary to the terms of Peak6's written offers to Lillien. Under Illinois law, a statement constitutes an employment contract only if it "set[s] forth a promise in terms clear enough to cause a reasonable employee to believe that an offer has been made." *Tatom v. Ameritech Corp.*, 305 F.3d 737, 742 (7th Cir. 2002) (quoting *Duldulao v. St. Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 318 (Ill. 1987)). "Whether a contract exists, and in particular whether a clear and definite promise has been made," is a threshold issue of law for the court. *Grottkau v. Sky Climber*, No. 93 C 6277, 1995 U.S. Dist. LEXIS 902 at *48 (N.D. Ill. Jan. 24, 1995). Absent a "clear promise," summary judgment must be granted. *Stacey v. Insurance Corp. of Ireland*, 545 N.E.2d 221, 224 (Ill. App. Ct. 1989).

Thus, it is my job to determine whether Hulsizer's statements concerning the $100,000 target bonus were part of the offer extended to Lillien. To support his claim that the statements were, in fact, part of that offer, Lillien cites *Tidwell v. Toyota Auto Mart, Inc.*, 375 N.E.2d 540 (Ill. App. Ct. 1978), which held that plaintiffs were entitled to an orally set bonus despite the fact that they had signed a form categorizing the bonus plan as discretionary. *Id.* at 541. While *Tidwell* does bear certain similarities to this case, key differences exist, which make it inapplicable. In *Tidwell*, the court found, from the wording of the signed bonus form, that the

3

discretionary language dealt with the dealership's decision to enroll an employee in its bonus plan and not with the amount of the bonus. *Id.* at 543. In this case, the language of Lillien's offer letters leads to the opposite conclusion. Both the May 4th and May 9th offer letters stated that Lillien would be "eligible for a year-end discretionary bonus...distributed based on both the profitability of the company and [Lillien's] contribution to the company's success." Unlike the bonus form in *Tiswell,* Peak6's offer letter guaranteed Lillien's enrollment in the bonus program but stated that the bonus amount was discretionary. Another key difference between *Tidwell* and this case is the nature of the respective plaintiffs' employment contracts. Unlike Lillien who received two written offers of employment, the plaintiffs in *Tidwell* were employed under an oral contract. Thus, it was somewhat more reasonable for the *Tidwell* plaintiffs to equate oral statements made by the defendant as part of their overall employment contract.

Peak6's May 9th offer letter to Lillien detailed all the basic terms of his employment (it listed his start date, salary, pay dates, bonus, stock options, 401(k) plan, health insurance, and vacation), clearly stating the bonus was discretionary. Viewed in light of the explicit nature of the offer letters, a reasonable person, let alone an experienced lawyer like Lillien, could not have interpreted Hulsizer's statements as an offer of a target or minimum bonus. Furthermore, the overall circumstances surrounding the offer would not have led a reasonable employee to conclude that the target bonus was part of Peak6's offer. During the same conversations in which Hulsizer allegedly promised Lillien a target bonus of $100,000, he also told Lillien that his bonus could be $0 or $1M depending on the company's performance, indicating again the bonus was discretionary. Additionally, Lillien contacted the Manager of Human Resources and inquired about setting out a specific bonus amount in the offer letter itself. She told Lillien that Peak6 did

4

not put specific bonus targets in writing. Given that the offer letters and Human Resource Manager's statements were wholly contrary to establishing a set bonus, Hulsizer's statements indicating that Lillien's bonus would most likely be $100,000 are not enough to bind Peak6. *Creswell v. Bausch & Lomb, Inc.*, No. 85 C 5822, 1986 U.S. Dist. LEXIS 17414 at *17 (N.D. Ill. Nov 20, 1986) (employer's oral prediction on plaintiff's otherwise discretionary bonus was not sufficient to bind the company.). Since Hulsizer's statements could be reasonably found to change the discretionary nature of Lillien's bonus, I find that summary judgment is appropriate.

### 2. Lillien's Stock Options

With regard to the promised stock options, Peak6 argues that it was not contractually obligated to provide Lillien with stock options because its promise was based on a condition precedent, the planned IPO, which never occurred. Under the prevailing Illinois law, "if the condition [precedent] remains unsatisfied, the obligations of the parties are at an end." *Lyntel Products, Inc. v. Alcan Aluminum Corp.*, 437 N.E.2d 653, 657 (Ill. App. Ct. 1981); *See Also Albrecht v. North Am. Life Assurance. Co.*, 327 N.E.2d 317, 319 (Ill. App. Ct. 1975). When Lillien accepted Peak6's job offer, he was fully aware that no stock plan existed and that any future stock plan would be contingent on a successful IPO. Peak6's May 4th and May 9th offer letters clearly stated that Lillien would receive stock options "in the event of an IPO" and that "the particulars of this stock option....are unwritten at this time." Since the IPO did not occur, I find that summary judgment on this claim is appropriate.

I am unpersuaded by Lillien's argument that proceeding with the IPO was a contractual duty owed to him. Generally speaking, IPOs are subject to regulatory and market forces beyond a company's control and are often derailed or postponed. Lillien knew that Peak6 had not

fulfilled the SEC's regulatory requirements, undertaken the requisite road shows to generate market interest, and priced the security. Understanding that those crucial steps still needed to be completed, Lillien could not have reasonably believed that Peak6 was contractually obligated to move forward with its IPO. Lillien does point out that for Peak6's offer to be competitive with UBS's offer, it had to include some equity in the compensation. However, when the amount of equity offered by UBS and Peak6 is compared, it is clear that the amount of equity offered by Peak6 had been adjusted for the inherent riskiness of the potential IPO. According to Lillien, Hulsizer and Just offered him $500,000 worth of stock options, more than three times the equity UBS was willing to provide.

**B. Lillien's Fraudulent Inducement Claim**

To support a claim of fraudulent inducement, Lillien must show that Peak6 made a false statement of material fact, Peak6 knew the statement was false, he reasonably relied on the truth of the statement, the statement was made for the purposes of causing him to act, and his damage resulted from reliance on the statement. *LaScola v. US Sprint Communications,* 946 F.2d 559, 567-68 (7th Cir. 1991). Lillien must support each of these elements with clear and convincing evidence. *Ackerman v. Northwestern Mut. Life Ins. Co.,* 172 F.3d 467, 469-70 (7th Cir. 1999). Peak6 argues that Lillien cannot establish either that Peak6's representatives made false statements of material fact or that he reasonably relied on the alleged false statements. Alternatively, Peak6 argues that Lillien waived any right to assert that claim by continuing to work for Peak6 after learning of the alleged fraud.

### 1. False Statements of Material Fact

First, Peak6 argues that Lillien's fraudulent inducement claim is deficient because no actionable fraudulent statements of material facts were made to him. Under Illinois law, a fraudulent statement "must relate to a past or present fact." *Bommelman v. Transfer Print Foils, Inc.*, No. 97 C 2082, 2000 U.S. Dist. LEXIS 9003 at *13-14 (N.D. Ill. June 20, 2000). A statement "which is merely an expression of opinion or which relates to future or contingent events, expectations or probabilities...ordinarily does not constitute an actionable misrepresentation." *Id.* (citing *Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1298 (7th Cir. 1993)). Thus, where the underlying statement "merely expresses an opinion or that relates to future or contingent events, rather than past or present facts," a fraudulent inducement claim must be dismissed. *LaScola*, 946 F.2d at 568. (affirming summary judgment for defendant where allegedly fraudulent statement did "not constitute an actionable representation.").

Here, Lillien does not dispute that Hulsizer's and Just's statements concerning the potential IPO related to a future event and are not, without more, actionable fraudulent statements. Instead, Lillien argues that his case falls under a well-established exception for situations where the statements were part of an overall scheme to accomplish a fraud. *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 545 N.E.2d 672 (Ill. 1989); *Steinberg v. Chicago Med. Sch.*, 371 N.E.2d 634, 641 (Ill. 1977). The scheme exception applies where "a party makes a promise of performance, not intending to keep the promise." *Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir. 1992) (quoting *Concord Industries, Inc. Harvel Indus. Corp.*, 462 N.E.2d 1252, 1255 (Ill. App. Ct. 1984)).

Lillien claims that Peak6, in an effort to entice him to accept its offer, made assurances that its IPO would close in May, failed to disclose the loss of its CFO, and failed to disclose its disappointing financial results. To make his case, Lillien faces an intentionally high burden. *Bower*, 978 F.2d at 1012. Because promissory "fraud is easy to allege and difficult to prove" it is a disfavored cause of action in Illinois. *Id.* In order to survive a motion for summary judgment, a plaintiff "must be able to point to specific, objective manifestations of fraudulent intent...If the rule were otherwise, anyone with a breach of contract claim could open the door to tort damages by alleging that the promises broken were never intended to be performed." *Id.*

Unfortunately for Lillien, the record falls well short of showing that Just and Hulsizer never intended to close the IPO. Instead, the evidence tends to show that Hulsizer and Just wanted to close the IPO but were unable to do so for financial reasons beyond their control. There is significant evidence showing that Peak6 was actively pursuing an IPO during the spring of 2001. Peak6 spent roughly $775,000, engaged underwriters who produced multiple schedules with an anticipated closing date in May, took on additional capital positions, filed its Form S-1, had attorneys working on an Amendment to its Form S-1, and was trying to hire both a General Counsel and CFO to make the transaction go more smoothly.

Despite the evidence that the IPO was progressing during the time period that Lillien was negotiating with Peak6, Lillien claims that Hulsizer and Just knew the IPO would not be completed on time because the CFO quit on April 25th and because Hulsizer had reported "flat" financial results for Peak6's second quarter. These two events, however, were not enough to forestall the possibility of a May IPO. First, Hulsizer's and Just's belief that Peak6 could proceed with either a new CFO or with Sue Hendrick, the woman who had historically been

responsible for Peak6's financials, was not unreasonable. The CFO had held his position for only a matter of weeks, hardly enough time to make him indispensable to the IPO process, and Peak6's bankers explicitly told Hulsizer and Just that Peak6 could proceed after the CFO's departure. Second, Lillien has taken Hulsizer's report of "flat" financials out of context. What Hulsizer actually said was that net revenues would be "flat compared to the first quarter." The $24 million in expected earnings for the second quarter of 2001 still substantially exceed the second quarter earnings for the prior year. Peak6's real financial trouble did not begin until mid-May, after Lillien had accepted Peak6's offer, and was caused by changes in market volatility, something that Hulsizer and Just could not predict. Since Lillien has not shown that Hulsizer and Just lacked the intent to close the IPO, I find that summary judgment is appropriate on this claim.[1]

## 2. Reasonable Reliance

Second, Peak6 argues that Lillien's fraudulent inducement claim is deficient because he cannot establish that he reasonably relied on Hulsizer's and Just's assurances that the IPO would close in May. It is undisputed that Hulsizer and Just told Lillien they expected to close the IPO in late May or early June. Peak6 claims that Lillien, an experienced corporate lawyer, knew there were still many important hurdles that remained before the IPO could take place and would not have relied on Hulsizer's and Just's assurances. Generally speaking, justifiable reliance is "a question of fact...properly decided by the trier of fact. *Bommerlman v. Transfer Print Foils, Inc.*,

---

[1] Given the business model prevalent throughout the period of years immediately on either side of the turn of the century, it is difficult to even imagine how a reasonable trier of fact could come to the conclusion that Hulsizer and Just had anything but a most profound hope and wish that the IPO would close.

9

2000 U.S. Dist. LEXIS 9003 at *22 (N.D. Ill. Jun. 20, 2000); *Calvin v. Leitner Thomas Group,* No. 00 C 8055, 2003 U.S. Dist. LEXIS 5077 at *7 (N.D. Ill. Mar. 31, 2003). While it may not have been wise for Lillien to rely on Hulsizer's and Just's statements, it was not, as a matter of law, unreasonable. Therefore, I find that summary judgment, on these grounds, would be inappropriate.

### 3. Waiver

Finally, Peak6 argues that Lillien waived his right to claim fraudulent inducement. Under Illinois law, "a person who has been misled by fraud or misrepresentation is required, as soon as he learns the truth, to disaffirm or abandon the transaction with all reasonable diligence." *DeSantis v. Brauvin Realty Partners,* 618 N.E.2d 548, 553 (Ill. App. Ct. 1993); *See Also City of Chicago v. Michigan Beach Hous. Coop.,* 696 N.E.2d 804, 809 (Ill. App. Ct., 1998); *Payne v. AHFI/ Netherlands, B.V.,* No. 79 C 1108, 522 F. Supp. 18, 24 (N.D. Ill. 1980) (plaintiff waived his claim by remaining with his employer for six months after learning of the employer's fraudulent statement.). Should a person fail to do so, he waives his ability to later claim fraudulent inducement. *DeSantis,* 618 N.E.2d at 553. The waiver rule exists to prevent a plaintiff from "[lying] back and speculat[ing] as to whether avoidance or affirmance of a contract will ultimately prove more profitable." *Id.*

Lillien learned of the IPO's postponement almost immediately after he started with Peak6 on May 30, 2001. Rather than abandoning his relationship, commencing a job search, or even objecting to the delay after learning of the alleged fraud, Lillien chose to remain with Peak6 until he was fired in January 2002. By staying with Peak6 for nearly seven months after the IPO was initially delayed and nearly three months after it was ultimately cancelled, Lillien was doing exactly what the Illinois law concerning waiver tries to prevent–waiting to determine which is the

more profitable course of action. Thus, I find that Lillien waived his fraudulent inducement claim by staying with Peak6 and grant summary judgment on these grounds as well.

For the reasons stated herein, Peak6's Motion for Summary Judgment is GRANTED.

ENTER:

James B. Zagel
United States District Judge

DATE: 25 June 2004